# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * *
MICHAEL MAGER, as parent of
VICTORIA MAGER,

                  Petitioner,

v.

SECRETARY OF HEALTH
AND HUMAN SERVICES,

                  Respondent.
* * * * * * * * * * * * * * * * * * * *

No. 14-820V
Special Master Christian J. Moran

Filed: December 5, 2022

damages, pain and suffering, epilepsy, death

<u>Renee J. Gentry</u>, Vaccine Injury Clinic, George Washington University Law School, Washington, DC, for petitioner;
<u>Zoe Wade</u>, United States Dep't of Justice, Washington, DC, for respondent.

### DECISION AWARDING COMPENSATION[1]

     Michael Mager established that the human papillomavirus ("HPV") vaccine his deceased daughter Victoria Mager received on September 11, 2012, significantly aggravated an epilepsy. The parties have now sought a determination as to a reasonable amount of pain and suffering Victoria suffered before her death. For the reasons explained below, the evidence supports an award of $115,000.00.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this ruling on its website. This posting will make the ruling available to anyone with the internet. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

When this item is combined with items about which the parties agreed, the total amount of compensation is $365,593.02.

I.   **Facts**[2]

Mr. Mager established that a September 11, 2012 HPV vaccination, which was Victoria's second dose, aggravated an epilepsy that had been dormant for approximately five years. Because Mr. Mager may receive compensation for the pain, suffering and emotional distress that Victoria suffered from the recurrence of her epilepsy until her death on January 11, 2014, the recitation of facts focuses on those 15 months.[3] See Pet'r's Memo. in Support of Pain and Suffering, filed Sept. 12, 2022, at 4 ("Mr. Mager is only seeking pain & suffering related to the events *following* the second dose on September 11, 2012.").

Victoria Mager was born on July 29, 1995. Thus, she turned 16 years old and therefore became eligible for a driver's license on July 29, 2011. On September 11, 2012, Victoria received her second HPV vaccination. Exhibit 4 at 1.

Approximately one month after the second HPV vaccination, Victoria suffered a seizure and was taken to the emergency department of Theda Clark Medical Center on October 10, 2012. Exhibit 7 at 9. Victoria reported she recalled having a headache before her seizure and she was having a temporal headache and nausea. Id. "She did bite her longue, She was not incontinent." Id. At the hospital, Victoria "denie[d] any injury or trauma." Id. at 16. Her weight was measured at 74 kg (163.1 pounds). Id. at 11. Her work-up, including an electrocardiogram, was normal. Id. at 13-14. As part of the doctor's examination, the doctor determined Victoria's speech was "normal. Her mood appears not anxious. . . . She does not exhibit a depressed mood." Id. at 12. She was diagnosed with a "probable seizure" and discharged. Id. at 14. When she was discharged, Victoria was recommended to see a neurologist in follow-up. Id. Because Victoria already had a seizure disorder, the doctors at the emergency room did not need to order an EEG. Tr. 525. The emergency room doctor instructed

---

[2] The undersigned has considered all the material in the record, although this ruling does not discuss all the material. This ruling focuses upon the evidence that the parties have emphasized.

[3] Information about earlier events in Victoria's life can be found in the other adjudications.

Victoria "not to drive until further evaluation can be completed at Marshfield." Exhibit 7 at 13.[4]

It appears that Victoria experienced two other seizures for which she did not seek medical attention emergently. She had a seizure at school on October 19, 2012 that was said to have lasted "3 minutes." Exhibit 9 at 6 (report to Dr. Edgar). Dr. Edgar reported that following that seizure, Victoria had an "immense headache" and "postictal lethargy." Id.; Exhibit 2 at ¶ 7 (Mr. Mager's first affidavit). According to a report created by a police officer investigating Victoria's death, Victoria was "embarrassed" about this seizure. Exhibit 15 at 19.[5]

She had a third seizure on November 7, 2012. Exhibit 9 at 39 (Dr. Budde's Nov. 8, 2012 report); id. at 6 (report to Dr. Edgar listing seizure on November 8, 2012).

Following her third seizure, Victoria saw her primary care doctor, Dr. Budde, on November 8, 2012. Exhibit 9 at 39. At this appointment, she reported that following her emergency room visit, she had additional seizures on October 19, 2012, and November 7, 2012. Id. Victoria also informed Dr. Budde that "she gets a rather severe headache following the seizure, but not prior to." Id. Dr. Budde recorded that although the doctors at Theda Clark had recommended an appointment with a neurologist, Victoria had not seen one. Id. Dr. Budde noted that Victoria "adamantly denies any drug or alcohol use." Id. A toxicology report on October 10, 2012 also indicated an absence of drugs or alcohol in Victoria's system. Exhibit 7 at 15-18; see also Exhibit 9 at 39.

---

[4] Whether Victoria had earned a driver's license is unclear. After her death Mr. Mager told an investigator "Victoria was also trying very hard to obtain a driver's license." Exhibit 13 at 5. Yet, on the night Victoria died, she "drove her vehicle." Exhibit 15 at 3.

[5] Mr. Mager's brief states "Per Mr. Mager, the seizure at the school resulted in her losing control of her bowels and waking up having urinated on herself in front of everyone." Pet'r's Memo. in Support of Pain and Suffering, filed Sept. 12, 2022, at 6. The brief does not cite any evidence for this assertion. The Secretary argued, "there is no evidence in the record to substantiate the assertion that Ms. Mager became incontinent during this seizure, or that she was emotionally devastated by the experience." Resp't's Resp. at 7. One of Mr. Mager's affidavits simply states: "On October 19, 2012, Victoria suffered another seizure while in class at Wautoma High School." Exhibit 2 ¶ 7 (affidavit, signed Sept. 30, 2014).

3

Dr. Budde also stated that Victoria "had trouble sleeping," felt "spacy," and may have been "losing some time during lectures or conversations that could represent absence-type seizures." Exhibit 9 at 39. A neurologist whom the Secretary retained, Dr. Kohrman, interpreted the history of feeling "spacy" as consistent with Victoria experiencing absence type seizures. Tr. 450. Dr. Shafrir, Mr. Mager's expert, disagreed, stating that feeling "spacy" "is not evidence for absence." Id. at 312.

In the history obtained by Dr. Budde, he wrote, "Sometimes, [Victoria] thinks she can feel them coming on as she will get an unusual sensation. She had a cramping sensation in her calf prior to one seizure." Exhibit 9 at 39. Dr. Shafrir interpreted this information as an "aura." Tr. 232, 309, 559-60. At the end of the appointment, Dr. Budde prescribed Depakote and facilitated a referral to a local neurologist, Dr. Terence Edgar. Exhibit 9 at 39.

Victoria saw Dr. Edgar on January 14, 2013. Exhibit 9 at 6-8. Dr. Edgar recorded that "Mom does report occasional staring spells, but it is unclear if there are absence seizures." Id. at 8. Dr. Edgar recorded that Victoria noted "she has gained at least 10 pounds since the initiation of Depakote." Id. at 7. She weighed 80 kg (176.3 pounds) and her height was 67 inches. Id.

An EEG was also performed. Exhibit 9 at 24-25. Dr. Edgar noted that the "EEG is normal during wakefulness. During sleep there is activation of infrequent potentially epileptiform activity over the left frontal and bioccipital head regions, consistent with the patient's history of generalized seizures." Id. at 25.

Dr. Edgar's impression was a primary generalized seizure disorder and he noted "age of onset at approximately 11 years of age suggests the possibility of juvenile myoclonic epilepsy, although no myoclonic seizures are reported." Exhibit 9 at 8. He further noted that Victoria "remains at significant risk or seizure reoccurrence." Id. Dr. Edgar also "inquired into the myoclonic seizures." Id. To Dr. Shafrir, Dr. Edgar's record that Victoria did not report myoclonic seizures was important. Victoria could not suffer from juvenile myoclonic epilepsy without having myoclonic seizures. Tr. 232-33. Dr. Kohrman was less concerned about the lack of reports about myoclonic seizures because myoclonic seizures can be difficult to detect.

Dr. Edgar recommended Depakote. But Victoria did not wish to remain on Depakote because of bad side effects previously. See Exhibit 6 at 9, 28. Thus, Dr. Edgar directed her to begin weaning off Depakote and prescribed a different anti-seizure medication, Keppra. Exhibit 9 at 8. Dr. Edgar instructed Victoria to

4

follow up in one year.  Id.  In Dr. Kohrman's opinion, Keppra was likely to be a less effective medication.  Tr. 467.

Victoria was supposed to have blood drawn at Berlin Hospital on March 1, 2013.  However, she did not appear.  Exhibit 9 at 15.  After an exchange of phone calls, Dr. Edgar ordered additional labs.  Id. at 13.  On June 18, 2013, Victoria's stepmother told Dr. Edgar that Victoria may miss a dose of Keppra "here and there."  Id.

During a follow-up appointment with Dr. Edgar on July 8, 2013, he stated that Victoria's compliance with her Keppra prescription had been "less than ideal," with a subtherapeutic level of the medication in her blood documented from a test on May 30, 2013.  Exhibit 9 at 3; see id. (noting Victoria "acknowledge[d] she [w]as very inconsistent in taking her meds").  Victoria weighed 75.6 kg (166.7 pounds).  Id. Victoria expressed a desire to discontinue use of Keppra, but Dr. Edgar persuaded her to remain on the drug given her history of seizures.  Id. at 4.  Because Victoria was concerned about not having insurance, Dr. Edgar gave her a three-month supply of Keppra.  Id.

The summer of 2013 was the summer after Victoria graduated from high school.  During her senior year, she earned a mixture of grades.  Exhibit 83 at 1.  According to Victoria's obituary, Victoria planned to enter military service.  Exhibit 110.  At Waukesha County Technical College in the fall of 2013, Victoria did not earn any credits as she failed two classes and withdrew from a third.  Exhibit 82 at 1.

In September or October 2013, Victoria experienced a seizure while working at Kohl's Department Store.  Mr. Mager told a police officer investigating Victoria's death that "approximately four months prior Victoria had a job at Kohl's Department Store . . . and suffered a seizure.  He stated that she then quit her job as she was embarrassed."  Exhibit 15 at 19.  If it is assumed that the police officer was using the date of Victoria's death in stating "four months prior," then this report places the seizure in September 2013.  However, Mr. Mager averred the seizure happened on "October 12, 2013."  Exhibit 2 ¶ 8.[6]  In any event, Victoria appears not to have reported this event to a doctor.

---

[6] Mr. Mager's affidavit likely contains a typographical error in that he continues: "In approximately *September* 2013, she was forced to quit her job at Kohl's Department Store after having a seizure on the job."  Exhibit 2 ¶ 8.

In November 2013, Victoria called Dr. Edgar's office to say that she was running out of medication. Exhibit 9 at 11. Due to the lack of records, Dr. Shafrir could not comment on Victoria's compliance with her medication in the fall of 2013. Tr. 349-50. According to an account Mr. Mager provided shortly after Victoria's death, she picked up more medication over the holidays. Exhibit 13 at 2. On January 2, 2014, Kathy Mager informed Dr. Edgar's office that Victoria intended to transfer her care to a doctor closer to her, although the doctor was not identified. Exhibit 9 at 9; see also Tr. 355.

Mr. Mager told medical examiners that in November 2013, Victoria was occasionally having seizures in her sleep unknowingly. Exhibit 13 at 2; Exhibit 16 at 3; see also Tr. 354. How Mr. Mager reached this conclusion is not clear as it appears that Mr. Mager was not living with Victoria at this time. Tr. 354. However, during the investigation of Victoria's death, an unnamed friend told a police officer that "Victoria had been having more frequent seizures. . . . [and] she did not like to her medication as it made her depressed and caused weight gain." Exhibit 15 at 13.

At the time of Victoria's death, she was working at Wendy's. Exhibit 15 at 20. Details about the duration of her employment are not available.

On January 11, 2014, after being discovered unresponsive at a friend's house, Victoria was rushed to the emergency department. Exhibit 8 at 1-2. She was pronounced dead upon her arrival. Id. at 2. As part of an investigation of her death by the Waukesha Police Department, Mr. Mager reported that Victoria had been "missing a lot of doses of her medication due to her work schedule and being forgetful" and that "she was having seizures more frequently." Exhibit 13 at 2. Mr. Mager also stated that "recently Victoria told him that she felt depressed when she took her [seizure] medicine." Exhibit 15 at 20.

An autopsy was performed by Dr. Zelda Okia on January 13, 2014. Exhibit 12 at 1. When Victoria died, she weighed 163 pounds and was measured as 69.6 inches long. Id. at 4. The findings included pulmonary edema and brain changes consistent with a seizure disorder. Id. at 2; Exhibit 16 at 10. The autopsy does not suggest any trauma. Exhibit 12 at 1.

A toxicology screen showed levels of Keppra in her blood. Exhibit 13 at 11. According to the toxicology report, regular dosing of Keppra results in 3-37 mcg/mL in the blood, with peak levels of 10-60 mcg/mL within 1.5 hours after dosage. Id. Victoria's toxicology results revealed 26 mcg/mL of Keppra in her blood at the time of death. Id. Both experts agreed that this level was appropriate. Tr. 302 (Dr. Shafrir: Victoria did not have low levels of medication in her blood at

the time of her death); id. at 467 (Dr. Kohrman: Keppra level of 26 is in the middle of the therapeutic range).

Sections of the brain showed focal areas of subpial gliosis. Exhibit 16 at 16. Gliosis occurs when glial cells cause structural changes to the central nervous system in response to trauma to the brain, such as seizures. Tr. 395-96. All the experts agreed that epileptic seizures can cause gliosis. Id. at 288 (Dr. Shafrir), 394-97, 415 (Dr. Fujinami). The amount of gliosis was not quantified. Id. at 289.[7]

Victoria's death certificate listed "seizure disorder" as her cause of death. Exhibit 1 at 1. The testifying neurologists agreed that Victoria suffered sudden unexpected death in epilepsy as a consequence of her epilepsy. Tr. 355 (Dr. Shafrir), 533-34 (Dr. Kohrman adding factors that placed Victoria at greater risk for a sudden and unexpected death); see also Spec. Mstr. Oral Arg. Tr. 648-49.

## II. Procedural History regarding Damages

Following a January 21, 2022 Opinion and Order, which vacated an underlying decision, Mr. Mager was found entitled to compensation. Entitlement Ruling, issued Apr. 19, 2022, 2022 WL 1495534. The following day, the parties were given instructions regarding compensation. Order, issued Apr. 20, 2022.

The parties were given time to resolve elements of compensation. After approximately three months, the parties had agreed to two items of compensation: first, $593.02 in unreimbursed expenses, and second, $250,000 for the death benefit. Jt. Status Rep., filed July 19, 2022. The parties also represented that they were not able to resolve the question of compensation for pain, suffering and emotional distress. Accordingly, a schedule for briefs was established.

Mr. Mager proposed that compensation for Victoria's pain, suffering, and emotional distress exceed the statutory cap of $250,000. Pet'r's Br., filed Sept. 12,

---

[7] Most of the testimony regarding gliosis concerned whether people with juvenile myoclonic epilepsy suffer gliosis. Dr. Shafrir stated "the presence of gliosis on the postmortem is not just a fact that may indicate there is ongoing damage to the brain, but it mostly indicates that she does not have JME." Tr. 550. Dr. Shafrir's assessment must be taken with some caution as he is not a pathologist (Tr. 287) and Dr. Kohrman and Dr. Fujinami stated that a person with juvenile myoclonic epilepsy can have gliosis. In any event, in advocating for their respective positions regarding compensation for Victoria's pain and suffering, neither Mr. Mager nor the Secretary based any argument on gliosis.

2022.[8]  Mr. Mager recounts aspects of Victoria's medical history in which she experienced painful events.  Id. at 5-6.  Compared with Victoria's pain, Mr. Mager argues that Victoria's "suffering and emotional distress" were "[f]ar more significant."  Id. at 6.  Items showing Victoria's suffering and emotional distress include embarrassment from having seizures at school and work, weight gain, depression, loss of her ability to drive, anxiety about the future, and surprise in the return of seizures after approximately five years of no reported seizures.  Id. at 6-11

With respect to potentially informative decisions, Mr. Mager asserted that "there are few recent damages decisions where the principal injury was seizures that resulted in death, and none upon Counsel's review that involved a significant aggravation of a pre-existing seizure disorder that resulted in death."  Id. at 4.  Nevertheless, Mr. Mager puts forward two cases involving Guillain-Barré syndrome: Fedewa v Sec'y of Health & Hum. Servs., No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2022) and Devlin v. Sec'y of Health & Hum. Servs., No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020).  Id. at 10-11.  In both those cases, petitioners were awarded $180,000 for past pain and suffering.

The Secretary disagreed with Mr. Mager and proposed that a reasonable amount of compensation for Victoria's pain, suffering, and emotional distress is $60,000.  Resp't's Resp., filed Oct. 19, 2022, at 1.  Like Mr. Mager, the Secretary separately evaluated compensation for, on the one hand, physical pain and, on the other hand, "emotional pain and suffering."  The Secretary generally contested the picture that Mr. Mager had attempted to portray in his brief.

For precedents, the Secretary agreed that "there do not appear to be any similarly-situated petitioners who have received damages awards in the Vaccine Program."  Id. at 5.  The Secretary addressed the cases Mr. Mager cited and relied upon a case involving multiple sclerosis and a case involving a syncopal event,

---

[8] The title to Mr. Mager's brief contains an ambiguity.  It reads "Petitioner's Memorandum in Support of *Petitioner's* Pain and Suffering Demand."  Mr. Mager is the petitioner.  However, the compensation awarded to him is for the pain, suffering, and emotional distress that *Victoria* suffered.  42 U.S.C. § 300aa–15(a)(4).  The Vaccine Act does not authorize compensation to the parents of a child who died due to an injury a vaccine caused.  Owens ex rel. Schafer v. Am. Home Prods. Corp., 203 F.Supp.2d 748 (S.D. Tex. 2022).  Regardless, Mr. Mager's brief accurately presents arguments regarding Victoria's pain, suffering, and emotional distress.

8

causing a fractured skull: Hitt v. Sec'y of Health & Hum. Servs., No. 15-1283V, 2021 WL 3598322 (Fed. Cl. Spec. Mstr. July 29, 2021) and H.S. v. Sec'y of Health & Hum. Servs., No. 14-1057, 2015 WL 6155891 (Fed. Cl. Spec. Mstr. Sep. 25, 2015).

Mr. Mager again requested the maximum award for Victoria's pain and suffering. Pet'r's Reply, filed Nov. 3, 2022. With the submission of the reply brief, the case is ready for adjudication.

### III.  Standards for Adjudication

A petitioner is required to establish his case by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

The Vaccine Act states that compensation shall include "(4) For actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." 42 U.S.C. § 300aa–15(a). Factors relevant to this element of compensation are "[(1)] the ability to understand the injury, i.e., the injured's mental faculties are intact; [(2)] the degree of severity of the injury; and [(3)] the potential number of years the individual is subjected to the injury." McAllister v. Sec'y of Health & Human Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).

### IV.  Analysis

Although the Vaccine Act recognizes three components: "pain and suffering and emotional distress," Hitt v. Sec'y of Health & Hum. Servs., No. 15-1283V, 2021 WL 39598322, at *4-5 (Fed. Cl. Spec. Mstr. July 29, 2021), the parties have organized their presentations around two topics. The first is "pain" and the second is "suffering and emotional distress." Thus, these topics are explored below.

#### A.  Physical Pain

Mr. Mager's argument regarding the physical pain that Victoria suffered focuses on reports of headaches, tongue biting, muscle soreness, and fatigue. Pet'r's Br. at 5-6. These events occurred in conjunction with or following seizures.

9

Mr. Mager maintains, "Victoria's seizures, by all accounts, continued, uncontrolled from the relapse on October 10, 2012 until her death on January 11, 2014, with each seizure resulting in the muscle aches, severe headaches, and frequently tongue-biting." Pet'r's Memo at 6.

The Secretary counters "Petitioner overstates the evidence." Resp't's Resp. at 3. The Secretary makes three points. First, Secretary argues "Ms. Mager's seizures were not continuous." Id. Second, the Secretary adds that Victoria's seizures were also not "uncontrolled." Id. (citing Decision Denying Compensation, 2021 WL 3737056 (Fed. Cl. Spec. Mstr. July 29, 2021), mot. for rev. denied on this ground and granted on other grounds, 158 Fed. Cl. 136 (2022)). The Secretary maintains the seizures were not uncontrolled because Victoria's use of anti-seizure medication was less than ideal, meaning a more consistent use of anti-seizure medication might have stopped the seizures. Finally, the Secretary argued "there is no reliable evidence in the record concerning the frequency or severity of any seizures occurring in the period after July 8, 2013, leading up to Ms. Mager's death." Id. at 4.

There is, however, some evidence that Victoria was continuing to suffer from seizures. Individuals whom Victoria was with just prior to her death told police investigators that "Victoria had been having more frequent seizures." Exhibit 15 at 13. However, there are no medical records documenting these seizures.

The Secretary suggests that Hitt offers some guidance in an award of pain calculations. Id. at 6. Ms. Hitt experienced a grand mal seizure and eventually developed multiple sclerosis. 2021 WL 3598322, at *2. The compensation for 6.5 years of minimal physical pain was $5,000. Id. at *6. Based upon a formula for monthly compensation derived from the award in Hitt, Victoria would be entitled to $961.54. Resp't's Resp. at 6 n.6.[9]

Mr. Mager maintains that the pain Victoria experienced was more severe than the physical pain Ms. Hitt experienced. Pet'r's Reply at 3-4. In addition, Mr. Mager emphasizes the statements from Mr. Mager and Ms. Regaldo in which those two people told police investigators that Victoria was having more seizures before she died. Id. at 1-2 (citing Exhibit 13 at 2 and Exhibit 15 at 13). These statements align, in Mr. Mager's view, with the testimony from a neurologist whom the

---

[9] Respondent's formula was calculated "by dividing the award of $5,000.00 by 78 months duration and multiplying by the fifteen months duration applicable to the present case. ($5,000.00 ÷ 78 x 15 = $961.54)." Resp't's Resp., at 6 n.6.

10

Secretary retained.  Dr. Kohrman stated Victoria "may well have been having lots more seizures. . . . So she had an uncontrolled epilepsy."  Tr. 534.

Evidence shows that Victoria suffered three seizures from October 10, 2012 until July 8, 2013.  For two of the three seizures, Victoria did not seek medical attention emergently.  The physical aspects of the seizures also appear to be headaches, muscle aches, and biting her tongue.  Exhibit 7 at 9.  There is no persuasive evidence that these problems lasted a significant time.

Ms. Mager's arguments tend to go beyond what the evidence shows.  Mr. Mager asserts that "Victoria seized and fell face-down on the ground – without being able to break her fall – and seized for several minutes.  Pet. Ex. 9 at 6.  It's reasonable to assume falling flat on one's face will elicit intense pain, and this is only one fall that happened to be recorded; with increasing amount of seizures occurring until her death, it's reasonable to assume there were more painful falls."  Pet'r's Reply at 3.

However, the medical record Mr. Mager cites actually recounts: "on 11/08/12, she had a generalized seizure event.  Dad heard a noise and found her face-down having a generalized seizure, eyes rolled back, lasted about 3 minutes in duration."  Exhibit 9 at 6.  This medical record, which Dr. Edgar created on January 14, 2013, does not state that Victoria fell without breaking her fall.  A medical record that Dr. Budde created on November 8, 2012 refers to a seizure on November 7, 2012.  Dr. Budde recounted that Victoria "does have a rug burn around her left eye where apparently she did injure herself with the last seizure."  Id. at 39.

Following the July 8, 2013 appointment with Dr. Edgar, evidence about Victoria's seizures is scarce.[10]  Victoria did not seek any medical attention.  While

---

[10] Mr. Mager states:  "Respondent attempts to downplay both Victoria's physical and emotional suffering, by repeatedly stating she had only three seizures and that they cannot have said to be uncontrollable or continuous."  Pet'r's Reply at 3.  But, this statement does not accurately represent the Secretary's position.

The Secretary maintained:  Victoria "experienced three seizures over a period of one month, and then no seizures for *at least* the following eight months."  Resp't's Resp. at 3 n.2 (citing Exhibit 9 at 4).  The Secretary also asserted that "Ms. Mager's medical records document only three seizures prior to her death."  Id. at 2.  Both these assertions are accurate.

11

Victoria experienced a seizure working at Kohl's in September or October 2013, she continued to work. She was working at Wendy's in January 2014. According to Mr. Mager, in November 2013, Victoria was experiencing seizures while sleeping. Exhibit 13 at 2; Exhibit 16 at 3. But, details about these seizures are lacking.

Mr. Mager urges consideration of Ms. Regaldo's statement and his statement to police investigators. Pet'r's Reply at 2. They are part of the record and merit consideration. See 42 U.S.C. § 300aa–13(a) (requiring special masters to consider the record as a whole). The problem, however, is that the statements are not very informative. Neither Mr. Mager nor Ms. Regaldo say when Victoria resumed having seizures, how frequently she was having seizures, or the duration of the seizures.

### B. Suffering and Emotional Distress

There also appears to be limited evidence detailing the extent of Victoria's suffering and emotional distress. As required by 42 U.S.C. § 300aa–13(a), the undersigned has considered all the evidence, even if the evidence is not discussed in this decision. The most relevant evidence shows the following aspects:

1. Victoria turned 16 years old on July 29, 2011 and became eligible for a driver's license.
2. Before the resumption of seizures on October 10, 2012, Victoria had not experienced any documented seizures for approximately five years.
    a. Victoria and her family were likely surprised that the seizures returned.
    b. The seizures "last[ed] anywhere from 1 to 3 minutes" Exhibit 9 at 46.
3. In the emergency room at Theda Clark on October 10, 2012, Victoria did not "exhibit a depressed mood." Exhibit 7 at 12.
4. The seizure at school on October 19, 2012 embarrassed Victoria. Exhibit 15 at 19 (Mr. Mager's statement to the police).
    a. Mr. Mager has not established that Victoria was incontinent during the seizure at school.

---

In reply, Mr. Mager also asserts that Victoria might have had seizures and not told him. While logically possible, the assertion in the brief does not constitute persuasive evidence that Victoria, in fact, had more seizures.

5. In the November 8, 2012 appointment with Dr. Budde, which was preceded by three seizures in one month, Victoria was having trouble sleeping and felt "spacy."  Exhibit 9 at 39.
   a. Prior to one seizure, Victoria reported ha[ving] a cramping sensation in her calf." Exhibit 9 at 39.
   b. To the extent that Victoria felt "spacy," it appears she had been "losing some time during lectures" in high school. Exhibit 9 at 39.
6. The seizures prevented Victoria from driving for at least some time. Exhibit 7 at 13.
   a. The duration of time Victoria could not drive is not known.
   b. The degree to which not driving inconvenienced Victoria is not known.
   c. Victoria was later able to drive, including up to the day before her death. Exhibit 15 at 4
7. Victoria gained, over three months, approximately 13 pounds. Exhibit 7 at 11 (Oct. 10, 2012), Exhibit 9 at 7 (Jan. 14, 2013).
   a. Over the following six months, Victoria lost approximately ten pounds.  Exhibit 9 at 3 (July 8, 2013).
   b. At autopsy, Victoria's weight matched her weight at the hospital on October 10, 2012.  Exhibit 12 at 3.
   c. A concern about weight gain contributed to Victoria's reluctance to take her anti-seizure medication.  Exhibit 15 at 13 (Ms. Regaldo's statement to the police).
8. Victoria graduated from high school.  Exhibit 83 at 1.
9. Between November 8, 2022 to July 8, 2013, Victoria did not report to have had any more seizures since her November 8, 2012 seizure. Exhibit 9 at 26-27.
10. Victoria's use of Keppra caused her mood problems.  Exhibit 9 at 2 (Dr. Edgar's July 8, 2013 letter).
11. Dr. Edgar's records do not contain a recommendation for Victoria to seek assistance from a psychiatrist, psychologist, or mental health counselor.
    a. The evidence does not include records from a psychiatrist, psychologist, or mental health counselor.
12. When taking anti-seizure medication in 2014, Victoria felt depressed. Exhibit 15 at 20 (Mr. Mager's statement to the police); Exhibit 13 at 2; Exhibit 15 at 13 (a friend's statement to the police).
13. The seizure at Kohl's Department store embarrassed Victoria and caused her to quit her job due to embarrassment. Exhibit 15 at 19 (Mr. Mager's statement to the police).

13

14. Victoria enrolled in Waukesha County Technical College in the fall 2013, where she struggled academically.  Exhibit 82 at 1.
15. Victoria was working at Wendy's.  Exhibit 15 at 20.
16. Before she died, Victoria was aware that she was likely to have follow up care from neurologists.  See Exhibit 9 at 9.
    a. Victoria expressed concern about maintaining her care given her lack of insurance.  Exhibit 9 at 27.
17. Victoria was aware of her pain, suffering, and emotional distress.
18. She died on January 11, 2014.  Exhibit 1 (death certificate).
    a. There did not appear to be any trauma to the body during the external examination of the autopsy.  Exhibit 15 at 12.
19. Victoria's pain, suffering, and emotional distress due to the aggravation of her underlying epilepsy lasted approximately 15 months.

The medical records suggest that Victoria was experiencing some emotional distress.  In spite of her suffering, she achieved some milestones common to typical adolescents, such as graduating from high school and starting college.  She was able, and continued to, drive up until the day before her death.  She moved out of her parents' house.  She worked at entry level jobs (Kohl's Department store and Wendy's), although embarrassment from a seizure led her to stop working at Kohl's.

Although there is relatively little direct evidence that Victoria was anxious, an inference that a person with epilepsy will worry seems reasonable.  For example, even if Victoria could legally operate a car, she could fear that she would have a seizure while driving.  Victoria's exploration of transferring her care to another neurologist evidences an awareness of a need for ongoing medical attention.  On the other hand, the duration of Victoria's suffering and emotional distress was limited to only approximately 15 months.

## C. Finding

Based upon the evidence and arguments, a reasonable amount of compensation for Victoria's pain, suffering and emotional distress is $115,000.  This determination is based upon the evidence in Victoria's case.

In finding the amount of compensation, the undersigned has considered the cases the parties cited in their briefs.  However, those cases do not present circumstances that sufficiently resemble the facts in the present case to inform the outcome of Victoria's case.  Victoria's case also differs from the cases about seizures in an annotation.  See Jay M. Zitter, "Excessiveness or Adequacy of

14

Damages Awarded for Injuries to Nerves or Nervous System," 51 A.L.R.5th 467 (1997).

However, more guidance can be found in a ruling regarding pain, suffering and emotional distress issued on November 4, 2022, which was shortly after the parties submitted their briefs. Ginn v. Sec'y of Health & Hum. Servs., No. 16-1466, 2022 WL 17331337 (Fed. Cl. Spec. Mstr. Nov. 4, 2022). There, various vaccines caused a four-year-old boy to have a febrile seizure in 2013. He eventually had 11 seizures, which appeared to have ceased in 2018. A doctor recommended psychological care for him as an adolescent. While the seizures ended in 2018, the award for pain, suffering and emotional distress was through the date of decision, approximately nine years. Based upon these and other factors, the special master found an award of $200,000 was a reasonable amount for past pain, suffering and emotional distress.

At a basic level, Ginn is informative because the injury the child experienced (seizures) is the same injury affecting Victoria. The harming vaccination was given to both R.G. and Victoria as children, although Victoria was already an adolescent. To the extent that Ginn can serve as a marker, other facts in Ginn suggests that the pain, suffering and emotional distress R.G. suffered was more severe and lasted longer than the pain, suffering and emotional distress for Victoria. For example, R.G. had more documented seizures than Victoria (11 versus 3). R.G. also endured his seizure disorder for a longer time than Victoria (9 years versus approximately 15 months). Moreover, R.G. experienced at least six of his seizures within a seven-month period after he received his vaccination. 2022 WL 17331337, at *9. Although Victoria reported to have suffered only from tongue biting during her reported seizures, R.G., for example, suffered from "nausea and vomiting, jerking, and loss of consciousness," was "nonresponsive except to painful stimuli" and was "disoriented and confused, had slurred speech." Id. at *2. These differences suggest that the award in Ginn should be higher than the award to Mr. Mager.

A reasonable amount of compensation for Victoria's pain, suffering and emotional distress is $115,000. When combined with the elements of compensation to which the parties stipulated, unreimbursed medical expenses ($593.02) and the death benefit ($250,000), the total amount of compensation is $365,593.02.

V.     **Conclusion**

Accordingly, Mr. Mager is awarded $365,593.02 in compensation. Pursuant to Vaccine Rule 28.1(a), the Clerk is directed to notify the Court of this decision.

The Clerk's Office is instructed to enter judgment in accordance with this decision unless a motion for review is filed. Information about filing a motion for review, including deadlines, is available on the website of the United States Court of Federal Claims.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master